UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:06-cr-00428-KJM |
| Plaintiff, | ORDER |
| v. | |
| Daryl M. Summerfield, | |
| Defendant. | |

Defendant Daryl Summerfield moves for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A). He argues his hypertension, type II diabetes, and BMI place him at risk of contracting severe illness from COVID-19 and provide "extraordinary and compelling reasons" to grant his request. The government opposes. It concedes Mr. Summerfield may have at least two medical conditions that increase his risk of severe illness from COVID-19 but argues the Bureau of Prisons (BOP) is managing his conditions, he has already recovered from COVID-19 with mild symptoms, and the § 3553 sentencing factors do not support a reduction in his sentence. For the following reasons, the court **grants** the motion.

I.      BACKGROUND

Mr. Summerfield is currently incarcerated at the administrative security federal medical center in Rochester, Minnesota (FMC Rochester) on money laundering and drug conspiracy charges. Beginning in January 2002, for about a year, Mr. Summerfield bought and remodeled a

duplex with $104,000 derived from cocaine sales.  Factual Basis at 2, Plea Agreement Ex. A, ECF No. 181.  From December 2003 to March 2006, Mr. Summerfield sent kilograms of cocaine to Alaska.  *Id.* at 1–2.  He also oversaw the shipment of two vans to Alaska for drug distribution purposes.  *Id.* at 1.  He was arrested in October 2006, Arrest Warrant, ECF No. 10, and ultimately pled guilty to conspiracy to distribute and "possess with intent to distribute at least 5 kilograms of cocaine" in violation of 21 U.S.C. §§ 846 & 841(a), Plea Agreement at 1.  He also pled guilty to "engaging in a monetary transaction in criminally derived property" in violation of 18 U.S.C. § 1957(a).  *Id.* at 1–2.  The parties' plea agreement invoked Federal Rule of Criminal Procedure 11(c)(1)(C), agreeing to twenty years on the first two charges and twenty years on the third, all to be served concurrently.  Plea Agreement at 2.  This court accepted the parties' agreement and sentenced Mr. Summerfield in 2012, to 240 months in prison with a 60-month term of supervised release.  J. & Commitment at 2–3.  His projected release date is October 18, 2023.  Mot. at 1, ECF No. 217; Opp'n at 4, ECF No. 221.  As of the date of this order, Mr. Summerfield has served more than 173 months of his 240-month sentence; this time amounts to 72 percent of his original sentence, or more than eighty percent of the sentence when accounting for good time credits.  *See* Mot. at 1; Opp'n at 4.

Mr. Summerfield moves to reduce his custodial sentence to time served under 18 U.S.C. § 3582(c).  He argues not only that his health conditions make him especially vulnerable to serious COVID-19 symptoms, but that his conduct in prison reflects his personal growth, and he will not pose a danger to society if released.  *See* Mot. at 5–10.  The government opposes the motion, arguing prison staff can treat Mr. Summerfield's medical conditions, he has already recovered smoothly from COVID-19, and his release would pose too great a danger to the community.  *See generally* Opp'n.  The matter is fully briefed, *see* Reply, ECF No. 225, and submitted on the papers.  *See* E.D. Cal. L.R. 230(g).

**II.    LEGAL STANDARD**

The district court that imposed a custodial sentence can modify the term of imprisonment under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018.  The defendant must first exhaust administrative remedies.  *Id.* §§ 3582(c)(1)(A).  If a defendant has exhausted

2

administrative remedies, the analysis is twofold. First, the court must find "extraordinary and compelling reasons warrant" the requested reduction. *Id.* § 3582(c)(1)(A)(i). Second, the court must consider the same factors that were applicable at the original sentencing, enumerated in 18 U.S.C. § 3553(a), to the extent they remain applicable. *See id.* § 3582(c)(1)(A).

Section 3582 further requires a reduction to be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* § 3582(c)(1)(A). In 2006, the Sentencing Commission issued a policy statement addressing what qualifies as "extraordinary and compelling reasons" to release a defendant from BOP custody. *See* U.S.S.G. § 1B1.13 (last amended November 1, 2018). The Ninth Circuit recently has clarified: "[t]he Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding." *United States v. Aruda,* No. 20-10245, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021). Thus, the court here adheres to its prior practice of considering the Sentencing Commission's policy statement as guidance, recognizing that applying the policy statement is not required.

Although the Ninth Circuit has not decided which party "bears the burden in the context of a motion for compassionate brought pursuant to § 3582(c) as amended by the [First Step Act], district courts that have done so have agreed that the burden remains with the defendant." *United States v. Becerra*, No. 18-0080, 2021 WL 535432, at *3 (E.D. Cal. Feb. 12, 2021).

### III. ANALYSIS

The parties do not dispute that Mr. Summerfield has exhausted his administrative remedies as required by § 3582(c). *See* Denial of Warden Req., Ex. C, Mot.; Opp'n at 4–5. The court thus considers (A) whether Mr. Summerfield's request is supported by extraordinary and compelling reasons and (B) whether the applicable sentencing factors of § 3553(a) weigh in favor of a reduction.

#### A. **Extraordinary and Compelling Reasons**

Many federal district courts, including this court, have found that defendants can demonstrate "extraordinary and compelling reasons" for compassionate release under § 3582(c)(1)(A)(i) if they show (1) their health conditions put them at increased risk of severe

3

COVID-19 symptoms and (2) they are at risk of infection because their facility is currently suffering from a COVID-19 outbreak or is at risk of an outbreak. *See, e.g.*, *United States v. Terraciano*, No. 17-00187, 2020 WL 5878284, at *3–4 (E.D. Cal. Oct. 2, 2020). Recent or ongoing rises in the reported number of infections might make for a stronger showing of "extraordinary and compelling reasons," but spikes and outbreaks have not always been necessary to support motions under § 3582(c)(1)(A). *See id.* at *3.

Mr. Summerfield is fifty-five years old, weighs 410 pounds and is 6 feet tall. Mot. at 7; BOP Medical Records at 137, Ex. E (under seal), ECF No. 228-1. His body mass index (BMI) thus exceeds 55 and places him in a category at higher risk of severe illness from COVID-19. U.S. Ctrs. for Disease Control & Prevention, *Adult BMI Calculator* (updated Sept. 17, 2020);[1] U.S. Ctrs. for Disease Control & Prevention, *People with Certain Medical Conditions* (updated Feb. 22, 2021) ("Having . . . severe obesity (BMI > 40kg/m2 or above), increases your risk . . . of severe illness from COVID-19.").[2] District courts within the Ninth Circuit, including this one, have consistently recognized obesity as a comorbidity that increases the risk of serious COVID-19 complications and may warrant compassionate release. *See, e.g.*, *United States v. Richardson*, No. 17-00048, 2020 WL 3402410, at *3 (E.D. Cal. June 19, 2020) (defendant with BMI of 38 qualified for compassionate release because "obesity alone" places a defendant "at higher risk of COVID-19 complications").

Mr. Summerfield also suffers from type II diabetes. BOP Medical Records *passim*. The CDC recognizes this health condition as one that increases the risk of severe symptoms if someone with the condition is infected with COVID-19. Mot. at 12; Opp'n at 10. *See also* U.S. Ctrs. for Disease Control & Prevention, *People with Certain Medical Conditions* (updated

---

[1] https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html, last visited April 8, 2021.

[2] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, last visited April 8, 2021. The court takes judicial notice of this information. *See, e.g.*, *Dubrin v. Cty. of San Bernardino*, No. 15-589, 2017 WL 8940181, at *21 n.14 (C.D. Cal. Sept. 7, 2017), *report and recommendation adopted*, 2017 WL 4339645 (C.D. Cal. Sept. 29, 2017) ("The Court may take judicial notice of the CDC information which is not subject to reasonable dispute, in part, because it is readily determined from a source the accuracy of which cannot reasonably be questioned (i.e., the CDC website).").

Feb. 22. 2021).[3]  Based on the public health data, district courts have reached the same conclusion in making findings related to compassionate release motions.  *See e.g., United States v. Levario*, No. 12-00399, 2020 WL 3256918, at *3 (E.D. Cal. June 16, 2020) (each of defendant's comorbidities alone—asthma, diabetes, hypertension, severe obesity—would increase his risk of contracting severe COVID-19); *United States v. Cornelio*, No. 17-00321, 2020 WL 6021466, at *3, 5 (D. Haw. Oct. 12, 2020) (granting compassionate release to defendant with BMI of 34.7, high cholesterol and undefined respiratory disorder; recognizing these conditions as placing defendant at greater risk of severe symptoms from COVID-19 if contracted).

Mr. Summerfield also suffers from "unspecified essential" hypertension.  *See* BOP Medical Records at 46, 49, 52, 86, 112, 137.  He is prescribed daily medication to treat this condition.  *Id.*  Some district courts have found that benign essential hypertension does not alone justify compassionate release.  *United States v. Thomas*, 471 F. Supp. 3d 745, 749–50 (W.D. Va. 2020) ("During the pandemic, courts in this district and across the country have released individuals suffering from hypertension, but only when these individuals also suffered from other underlying medical conditions.").  As one court has noted, "the CDC only identifies pulmonary hypertension, not essential hypertension, . . . as increasing the risk for severe COVID-19 infection."  *United States v. Brown*, No. 3:13-14, 2020 WL 3511584, at *6 (E.D. Tenn. June 29, 2020).  Some courts, including this one, have granted release to defendants whose hypertension was not identified as pulmonary hypertension, and courts have sometimes also found that hypertension generally can alone increase the risk of severe COVID-19.  *See Richardson*, 2020 WL 3402410, at *8 ("Defendant's hypertension alone places him at significant risk of complications."); *United States v. Sanders*, No. 19-20288, 2020 U.S. Dist. LEXIS 67595, at *10 (E.D. Mich. Apr. 17, 2020) ("Several courts . . . have identified hypertension as an underlying medical condition that renders a prisoner higher-risk, weighing against continued detention during the COVID-19 pandemic."); *see also Terraciano*, 2020 WL 5878284, at *4 (collecting cases).  Here it is unnecessary to decide whether a defendant's essential hypertension, regardless of classification, can alone support a motion for compassionate release under § 3582, because the

---

[3] *See supra* note 2.

1  parties do not dispute that Mr. Summerfield's BMI and type II diabetes increase his risk of severe
2  symptoms if he contracts COVID-19.  If his hypertension also is a risk factor, it would only
3  strengthen his case.

4        The government's primary response to Mr. Summerfield's argument that his medical
5  conditions increase his risk of severe COVID-19 is that he has already contracted and recovered
6  from COVID-19 with mild symptoms.  Opp'n at 11.  Some courts have found, in light of the
7  scientific uncertainty, that a previous infection cuts against a request for compassionate release.
8  *See, e.g., United States v. Molley*, No. 15-0254, 2020 WL 3498482, at *2 (W.D. Wash. June 29,
9  2020) ("[R]eleasing uninfected inmates mitigates the concrete risk of [infection;] . . . releasing
10 [defendant] would reduce the risk of him getting reinfected.  That risk is . . . speculative.").
11 However, other courts, including this one, have opted to "err on the side of caution to avoid
12 potentially lethal consequences," because "simply announcing that an inmate has 'recovered'
13 does not mean [a defendant] is completely safe from the virus."  *United States v. Armstrong*, No.
14 18-5108, 2020 WL 4366015, at *3 (S.D. Cal. July 30, 2020) (quotation marks and citation
15 omitted); *see also United States v. Yellin*, No. 15-3181, 2020 WL 3488738, at *2 (S.D. Cal.
16 June 26, 2020) (granting compassionate release to defendant with underlying medical conditions
17 who was infected with COVID-19, but who did not develop severe symptoms, based on risks of
18 reinfection, among other reasons); *United States v. Fernandez*, No. 16-00115-KJM, 2020 WL
19 5909490, at *4 (E.D. Cal. Oct. 6, 2020) (granting compassionate release to defendant with
20 asthma, chronic kidney disease, and obesity who had been infected with COVID-19 but
21 recovered, due to lack of scientific certainty regarding risks of reinfection).

22       At this time, approximately a year into the coronavirus pandemic, the CDC and other
23 federal health agencies have not published detailed guidance about the risks of reinfection.
24 Rather, the CDC's most recent guidance was published several months ago and reports no
25 concrete findings about the risks of reinfection or the likely symptoms upon reinfection, let alone
26 the likely severity of symptoms among those with comorbidities such as diabetes, obesity, or
27 hypertension.  *See* U.S. Ctrs. for Disease Control & Prevention, "Reinfection with COVID-19"

(updated Oct. 27, 2020).[4]  The parties have offered neither expert testimony nor pointed to scientific literature about the risks of reinfection or the severity of symptoms for people with health conditions similar to those Mr. Summerfield presents.  The defense does cite an article summarizing the case of a twenty-five-year-old man with no history of clinically significant underlying conditions who suffered more severe symptoms, including hypoxia, after a COVID-19 reinfection.  Reply at 7, ECF No. 225 (citing Richard Tillet et al., *Genomic Evidence For Reinfection With SARS-CoV-2: A Case Study*, 21 Lancet 52–58 (Oct. 12, 2020)).  But that article is based on a single case study only.  Without expert interpretation, its implications for Mr. Summerfield and others are uncertain.  At most it suggests that severe symptoms are possible upon reinfection despite recovery from an original infection with only mild symptoms.  Considering all of the information in the record in this case, the court confirms its view that a defendant's recovery from COVID-19 does not preclude a finding that "extraordinary and compelling reasons" exist and support granting a motion brought under § 3582(b)(1)(A)(i).  Mr. Summerfield's health conditions justify finding extraordinary and compelling reasons to reduce his sentence, and thus the court continues to the next step of the compassionate release analysis.

        The court also considers whether Mr. Summerfield's housing conditions at FMC Rochester place him at increased risk of reinfection, referencing information reported by the BOP and looking to recent decisions by other federal district courts.  At the time the government filed its opposition, the BOP reported active COVID-19 cases among four staff members and four incarcerated persons at FMC Rochester.  Opp'n at 5.  As of this writing, the BOP is reporting two incarcerated people and one staff person testing positive for COVID-19.  *See* Federal Bureau of Prisons, *COVID-19 Cases*.[5]  It reports 426 people have recovered, 369 incarcerated individuals plus 57 staff members.  *Id.*  The BOP also reports 311 staff members have now been vaccinated, as have 286 out of more than 500 of those incarcerated.  *See* Federal Bureau of Prisons, *COVID-*

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html, last visited April 8, 2021.

[5] https://www.bop.gov/coronavirus/, last visited April 14, 2021.

*19 Vaccine Implementation*.[6] Neither Mr. Summerfield nor the government states whether he has been vaccinated or whether he is scheduled to receive a vaccine by a certain date.

Other district courts considering motions for compassionate release filed by those incarcerated at FMC Rochester have reached conflicting conclusions about the risk of infection there. Many have denied motions for compassionate release, citing the low reported numbers of active cases and FMC Rochester's capacity to provide medical care. *See e.g., United States v. Holper*, No. 18-00037, 2020 U.S. Dist. LEXIS 184100, at *6 (D. Nev. Oct. 5, 2020) (finding "the low number of reported cases at FMC Rochester suggests" the institution was effectively controlling the virus's spread); *United States v. Iwai*, No. 15-00723, 2020 WL 6470167, at *4 (D. Haw. Nov. 3, 2020) ("FMC Rochester is a medical facility and . . . there have been no COVID-19-related deaths reported there, despite roughly 100 total inmate infections."); *United States v. Roney*, No. 10-130, 2020 WL 2846946, at *6 (W.D.N.Y. June 2, 2020) (collecting authority and finding defendant could not obtain compassionate release on basis of "the general possibility that he could contract COVID-19," because he did not show "FMC Rochester's plan and efforts to combat the disease [were] inadequate or that FMC Rochester [was] unable to adequately treat him if he falls ill"), *aff'd*, 833 Fed. App'x 850, 855 (2d Cir. 2020) (unpublished) (affirming despite rising number of infections within FMC Rochester at time). Here, Mr. Summerfield's recovery from COVID-19 without experiencing serious symptoms suggests on the one hand that FMC Rochester can and has cared for incarcerated persons including him who have a high risk of a serious case of COVID-19. *See, e.g.*, *United States v. Gipson*, 2020 WL 6743859, at *1 (9th Cir. Nov. 17, 2020) (unpublished) (affirming denial of compassionate release because defendant's "health conditions, including his COVID-19 diagnosis, have been adequately managed by the Bureau of Prisons").

But other courts have granted compassionate release to defendants residing at FMC Rochester even when the BOP has reported no active cases. *See, e.g., Street v. United States*, No. 15-20624, 2020 U.S. Dist. LEXIS 131808, at *7 (E.D. Mich. July 27, 2020) ("[T]he Court's concern for [the defendant's] safety is not dissuaded [*sic*] by the fact that FMC Rochester has no

---

[6] https://www.bop.gov/coronavirus/index.jsp, last visited April 14, 2021.

reported inmate cases of COVID-19. . . . The prison's report of zero confirmed cases is more likely a result of a lack of testing rather than the virus' absence in the prison."); *United States v. Conner*, 465 F. Supp. 3d 881, 891 (N.D. Iowa June 2020) ("[N]o active confirmed cases does not mean that COVID-19 is not present at the facility.  Nor does it mean there will not be a future outbreak at the facility.").  One district court recently granted compassionate release to a defendant at FMC Rochester who presents with the same health conditions as Mr. Summerfield. *See United States v. King*, No. 15-50050, 2020 U.S. Dist. LEXIS 194064, at *17 (D.S.D. Oct. 20, 2020); *see also United States v. Reddest*, No. 05-50116, 2020 WL 6044071, at *4 (D.S.D. Oct. 13, 2020) (finding type II diabetes and heart conditions created extraordinary and compelling reasons despite otherwise "adequate medical care" at FMC Rochester but denying release on review of the § 3553(a) factors), *appeal filed*, No. 20-3203 (Oct. 21, 2020).

Balancing the data reviewed above and having reviewed the relevant authority catalogued here, this court finds that Mr. Summerfield has narrowly demonstrated that, given his particular combination of health conditions, the prison conditions to which he is exposed are sufficiently uncertain so as to support compassionate release.  To review, FMC Rochester has seen a total of 369 incarcerated people and 57 prison staff test positive for the virus over the last year; even without knowing how comprehensive testing has been, these numbers demonstrate to this court the facility has not been able to meaningfully control the spread of the virus, even though it is a medical facility; 369 incarcerated people with COVID-19 represents more than half of FMC Rochester's population of 640. Federal Bureau of Prisons, *COVID-19 Cases;*[7] *but see Holper*, 2020 U.S. Dist. LEXIS 184100, at *6.  And here, erring on the side of caution as it has in assessing compassionate release motions, the court finds Mr. Summerfield's specific combination of health conditions and therefore his high risk of severe symptoms if he contracts COVID-19 again weigh in favor of granting his motion, despite his previous recovery.  While the government pointed to Mr. Summerfield's recovery from COVID-19, they did not share how FMC Rochester ensured patients healed quickly.  The government did not provide a declaration attesting to FMC Rochester's quarantine policy, nor its overall approach to COVID-19.

---

[7] *Supra* note 5.

9

**B.     Section 3553(a) Sentencing Factors**

Even though Mr. Summerfield has established he faces a high risk of severe symptoms if he contracts COVID-19 again, that still does not end the analysis under § 3582(c)(1)(A). To grant a motion for compassionate release, the court must also be satisfied that the requested reduction in sentence would not conflict with the relevant factors listed in 18 U.S.C. § 3553(a). Additionally this court in its discretion analyzes whether the defendant's release would put the community at risk.

First, Mr. Summerfield's crimes were serious. *See* Plea Agreement at 2; Factual Basis at 1–2. The government argues correctly Mr. Summerfield "oversaw a vast drug-trafficking empire" responsible for shipping hundreds of kilograms of cocaine. *See* Presentencing Report (PSR) at 3–32, Ex. D (under seal), ECF No. 228. At the same time, convictions for drug trafficking conspiracies are not a bar to granting compassionate release for defendants if extraordinary and compelling circumstances exist. *See, e.g.*, *United States v. Barron*, No. CR 94-559-GW, 2020 WL 4196194, at *1 (C.D. Cal. July 9, 2020) (granting compassionate release to defendant sentenced to 20 years for drug and money launder charges involving 1,500 kilograms of methamphetamine). That said, "the nature and circumstances of [Mr. Summerfield's] offense" and the "seriousness of [his] offense" weigh against his request for release. *See* 18 U.S.C. § 3553(a)(1), (2)(A).

Second, Mr. Summerfield has shown a commitment to rehabilitation in prison. Since 2013, he has regularly attended classes in art, wellness, Spanish, resume building and a "men of influence" series. Mot. at 10. He also received a certificate from the FMC Rochester Chapel for completing a "Boundaries" classes. Ex. F, Reply, ECF No. 225-3. The government does not dispute this positive programming, nor does it disagree that Mr. Summerfield has been disciplinary free for at least the past six months; in fact the government does not point to any disciplinaries as raising a concern. Mot. at 10; *see* Opp'n at 15. Mr. Summerfield's efforts to rehabilitate himself during his custodial sentence weigh in support of his motion. *See* 18 U.S.C. § 3553(a)(2)(A), (D) (identifying need for sentence to promote "respect for the law," and "needed educational or vocational training, medical care, or other correctional treatment").

Third, as noted, Mr. Summerfield has completed more than 72 percent of his custodial sentence, fourteen years. His completion of a large portion of his sentence contributes to satisfying the need to provide "just punishment for the offense," to "afford adequate deterrence," to account for the Guidelines sentencing range, and to "avoid unwarranted sentencing disparities." 18 U.S.C. § 3553(a)(2)(B), (a)(4), (a)(6).

Fourth, the court considers the need to "protect the public from further crimes" and "any pertinent policy statement," including by exercising its discretion to consider any dangers early release might pose to the community. *See* 18 U.S.C. § 3553(a)(2)(C), (a)(5); *Numann*, 2020 WL 1977117, at *2 (citing U.S.S.G. § 1B1.13(2)). Although Mr. Summerfield has a concerning criminal history including prior convictions for thefts and firearms crimes, *see* PSR at 16–19, the court took his criminal history into account when accepting the parties' agreement regarding his custodial sentence, imposing the lengthy sentence most of which he has served. Although his conviction offenses here are serious, comprising heavy drug charges and money laundering, they reflect crimes that, factually, did not involve violence. His criminal history appears to stem, at least in part, from his substance abuse. *See id.* at 19–21 (describing defendant's history with substances). Mr. Summerfield's relatively advanced age of fifty-five, the five-year term of supervised release he still faces, and his release plan mitigate the danger his release might otherwise pose to the community. His plan involves living with his daughter, Kinika Moore, and her children. Ms. Moore has remained in contact with him, and she will provide housing, transportation, and financial support until he can support himself. Mot. at 11. The Federal Defender's office has compiled a detailed proposal identifying the extensive community and family support that will be available to Mr. Summerfield as he reenters the community.[8] Release

---

[8] The court granted in part the request to seal Mr. Summerfield's entire release plan. *See* ECF No. 229; Minute Order, ECF No. 231. The court found that redacting the personal information of family members and future employers presents a compelling interest, and in the absence of redaction, those compelling interests would be harmed. *Oregonian Publishing Co. v. U.S. District Court for the District of Oregon,* 920 F.2d 1462 (9th Cir. 1990). The defense has now filed a redacted version of the release plan on the public docket, *see* Release Plan, ECF No. 233, and the unredacted release plan is filed under seal to complete the record, Redacted Release Plan, ECF No. 232.

Plan, ECF No. 233 (redacted).  That release plan may be referenced by the court's probation office as a resource during supervised release.  Finally, this court is advised the probation office has confirmed the proposed residential address is approved, and a condition of home confinement is not recommended.

In sum, Mr. Summerfield's combination of medical conditions place him at high risk of experiencing severe complications from COVID-19 if he is reinfected, and those conditions provide extraordinary and compelling reasons justifying compassionate release under the statute. His participation in prison rehabilitation programming and his extensive release plan mitigate the risk of danger to the community upon his release.  The court therefore reduces Mr. Summerfield's sentence to time served.

### IV.     CONCLUSION

The motion for compassionate release, ECF No. 217, is **granted.**

The court modifies Mr. Summerfield's sentence of incarceration of 240 months to **time served**.  All previously imposed conditions of supervised release remain in effect.

There being a verified residence and an appropriate release plan in place, this order is stayed for up to seven days for Mr. Summerfield to make appropriate travel arrangements and for BOP to ensure the defendant's safe release. The defendant shall be released as soon as appropriate travel arrangements are made and it is safe for the defendant to travel.  There shall be no delay in ensuring travel arrangements are made.  If more than seven days are needed to make appropriate travel arrangements and ensure the defendant's safe release, then the parties shall immediately notify the court and show cause why the stay should be extended.

The court orders Mr. Summerfield to self-isolate for fourteen days in the residence of Kinika Moore upon his arrival there, as a means of protecting his health and that of the others residing in the home.  He must also comply with all applicable public health orders.

This order resolves ECF No. 217.

IT IS SO ORDERED.

DATED: April 15, 2021.

CHIEF UNITED STATES DISTRICT JUDGE